IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MOORE, | No. C 07-03850 SI |
| Plaintiff, | **ORDER GRANTING IN PART DEFENDANT'S MOTION FOR SANCTIONS** |
| v. | |
| GILEAD SCIENCES, INC., | |
| Defendant. | |

Defendant's motion for sanctions is scheduled for a hearing on March 2, 2012. Pursuant to Civil Local Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, VACATES the hearing, and hereby rules as follows.

**BACKGROUND**

From 2003 to 2008, Gilead, a corporation that develops and markets pharmaceutical drugs, employed plaintiff Moore as a Therapeutic Specialist, Gilead's term for a sales representative. Pl.'s Fourth Amended Compl. ("4AC") at ¶ 8. As a sales representative, Moore marketed HIV drugs in the Brooklyn, New York area. *Id.* On November 15, 2006, Moore sued Gilead under the *qui tam* provisions of the False Claims Act, alleging that Gilead was paying physicians to induce them to prescribe Gilead's HIV/AIDS medication. *Id.* at ¶ 14. On March 26, 2008, Moore took a medical leave of absence, alleging anxiety and insomnia problems resulting from the filing of the *qui tam* action. *Id.* at ¶ 19. In August 2008, while Moore was on this medical leave, the Government partially unsealed the *qui tam* complaint, disclosing Moore as the *qui tam* plaintiff. *Id.* at ¶ 24. That same month, Moore informed Gilead that he was prepared to return to work, but was told by Gilead that he would have to re-apply and

interview for his job. After interviewing him for his old position, Gilead declined to re-hire Moore and formally separated Moore from the company in October 2008. *Id.* at ¶ 38.

Moore alleges that Gilead illegally discharged him in retaliation for refusing to participate in Gilead's allegedly illegal schemes and for filing the *qui tam* action against it. *Id.* at ¶ 40. In the 4AC, Moore added allegations that Gilead discriminated against him on the basis of his disability by refusing to allow him to return to work when he was ready to do so. *Id.* at ¶ 51. Moore claims that Gilead violated the Federal False Claims Act, 31 U.S.C. § 3730(h) (Count I); New York Labor Law § 740 (Count II); New York False Claims Act, New York Finance Law § 191 (Count III); and New York State Human Rights Law and New York City Human Rights Ordinance (Count IV).

On August 1, 2011, Gilead filed a motion for sanctions requesting dismissal of this action and monetary damages based upon Moore's spoliation of evidence. Def.'s Mot. for Sanctions ("Def.'s Mot."), Doc. 78. At his deposition, Moore admitted to "wiping" the hard drive of his company-issued laptop multiple times in 2006 and at least once in 2008. The laptop had been given to Moore by Gilead to use as part of his work as a sales representative for Gilead. Moore Decl. ¶ 7. Moore also used the laptop for personal uses, as well as to communicate with his attorneys involved in the *qui tam* action. *Id.* at ¶¶ 4-8.

In order to wipe his computer, Moore purchased software called "Secure Clean 4," which, according to its user manual, is "designed to provide every user with the highest level of personal privacy protection by finding and overwriting old data, making it impossible to recover." Gaskins Decl., Ex. C, at CR-1. The software permanently erased files from the hard drive that Moore had designated for deletion. Moore Dep., 133:1-7. Moore used the software at least six times in 2006, the latest being on November 8th – one week before he filed the *qui tam* complaint. Gaskins Decl., Ex. C. CR1 at 3. According to Gilead's forensic analysis of the hard drive, the use of the applications resulted in the erasure of 10,040 deleted items. *Id.* at 14.

On December 7, 2006, having received a subpoena from the Department of Justice, Gilead issued a records hold memorandum (the "Records Hold"). Moore received the Records Hold, which stated that the recipient must "PRESERVE, AND NOT DESTROY" a number of categories of documents related to the *qui tam* complaint. Gaskins Decl., Ex. D. at 1-2.

2

Despite this, in August 2008 - around the time that Moore was informed that he would have to reapply for his job in order to return from sick leave, and around the time his name was revealed as the relator in the *qui tam* complaint - Moore performed a complete wipe of his hard drive. In order to do so, he used software named "Wipe Drive." Moore Dep., 113:16. The software rendered permanently irretrievable the data on his hard drive. When asked why he deleted the information from the hard drive in 2008, Moore responded:

> Why did I – I deleted the information from the hard drive because I didn't want Gilead, who was out to do me harm, going through my personal emails. It was a, to be honest with you, it was a matter of personal privacy. I felt like my privacy was being invaded. How would you feel if your enemy was going through your emails? That was the first reason.
>
> The second and most important reason is that I was communicating with my lawyers on that computer for three years, and I didn't want Gilead to have access to that information. I, my feeling was that I didn't have anything on the hard [sic], there was nothing really in terms of documents. All of the documents that I did have are relevant to the case and were, the reason for this, you know, for these document holds was because the federal government required the documents. I already handed all the documents over to the federal government.
>
> In addition Gilead had my computer three times a year, and they would take the computer at the beginning of the sales meeting, and they would give it back at the end of the sales meeting backing everything up. And in terms of my emails, going through my Gilead emails, all of that went through the Gilead server. So, in my view, I was doing nothing wrong. In retrospect I would have done it differently.

Moore Dep., 111:18-113:-1. Moore supplements his rationale in his later filed declaration by arguing that "there was a Court Order in place at that time" and that he had an "obligation to ensure that no documents or emails subject to that Court Order would be turned over to Gilead Sciences." Pl.'s Opp. at 3 (citing Moore Decl. ¶¶ 32, 42). Moore does not provide the order nor state what court issued it.

Gilead claims that, in sum, from 2006 through 2008, Moore intentionally destroyed over 10,000 relevant documents, correspondence, electronic mail, and other pieces of evidence. Gilead argues that the deleted evidence may have been critical to its defense in both the dismissed *qui tam* action as well as Moore's retaliation action. On August 1, 2011, Gilead moved for terminating sanctions and monetary damages due to Moore's spoliation of evidence. Moore filed an opposition on February 3, 2012, and Gilead replied on February 21, 2012.

## LEGAL STANDARD

Federal trial courts are vested with a wide range of inherent powers that allow them to govern their courtrooms and the litigation processes before them. *Chambers v. Nasco*, 501 U.S. 32, 43 (1991). An example of these inherent powers is the discretionary power of a federal trial court to levy appropriate sanctions against a party who prejudices its opponent through the spoliation of evidence that the spoliating party had reason to know was relevant to litigation. *Glover v. Bic Corporation*, 6 F.3d 1318 (9th Cir.1993). Inherent powers must be used only with restraint and discretion. *Chambers*, 501 U.S. at 44.

To levy sanctions due to spoliation of evidence, the Court must find that the offending party destroyed evidence with notice that the evidence may be relevant to pending litigation. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 959 (9th Cir. 2006). The duty to preserve documents attaches when future litigation in which the documents may be evidence is "probable." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893, at *21 (N.D.Cal. 2006) (Whyte, J.) If a duty existed, the court must also consider the prejudice suffered by the non-spoliating party and the level of culpability of the spoliator. After considering these factors, a court must then consider all available sanctions and determine the appropriate one. *See e.g. Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423 (2nd Cir.2001); *Wm. T. Thompson Co. v. GNC*, 593 F.Supp. 1443 (C.D.Cal.1984).

Dismissal is an available sanction when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Leon,* 464 F.3d at 959 (*citing Anheuser-Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)). Before imposing the "harsh sanction" of dismissal, however, the district court should consider the following factors: "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." *Id.*

**DISCUSSION**

**I.    Duty to Preserve**

The initial question before the Court is whether Moore had a duty to preserve the documents. "As soon as a potential claim is identified, a litigant is under a duty to preserve evidence which it knows or reasonably should know is relevant to the action." *In re: Napster, Inc. Copyright Litigation*, 462 F. Supp. 2d 1060, 1068 (N.D.Cal. 2006) (Patel, J.). Here, Moore first contacted an attorney regarding his False Claim Act concerns in the Spring of 2006. Moore Dep., 48:19-49:4.[1] At least from the time Moore contacted an attorney to begin pursuing his claims, he had a duty to preserve documents that were relevant to the action. Instead, throughout 2006, Moore repeatedly ran software to render irretrievable documents he chose to delete, including one week before filing the *qui tam* action. Gaskins Decl., Ex. C, CR1. Gilead issued a Records Hold in December 2006 in response to the DOJ subpeona; despite this, in August 2008, Moore completely wiped his laptop's hard drive. Moore Dep., 111:7-8.

Moore argues that he had no duty to preserve the "personal and privileged" contents of his laptop. Pl.'s Opp. at 7. Specifically, he argues that (1) he had a reasonable expectation of privacy in his laptop and (2) at least some of the deleted documents were covered by attorney-client privilege. *Id.* Regarding the first claim, Moore argues that the Gilead Computer Usage Policy allowed for reasonable personal use. However, Moore does not explain how, even if true, that would allow him to circumvent the rule requiring preservation of evidence for pending litigation. Nor does the second contention save his claim, as the proper procedure for privileged documents is to assert that privilege, not to destroy the evidence. It was not up to Moore to determine what documents were privileged. *See Leon*, 464 F.3d at 959 ("[B]ecause the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist, a [spoliating] party can hardly assert any presumption of irrelevance as to the destroyed documents.")

Moore also argues that the deletion activities occurred both too early and too late to be affected

---

[1] Moore also began other steps in furtherance of the *qui tam* litigation in early 2006, namely, secretly taping his colleagues and increasing the number of speaker programs for doctors that he considered illegal. Moore Dep. 76:20-77:6.

5

by the Records Hold. He points out that the 2006 deletions occurred prior to the issuance of the December 2006 hold memorandum, and argues that the August 2008 deletions occurred after the government identified him as the *qui tam* relator, which, according to him, meant that the government had concluded its investigation of the action. Pl.'s Opp. at 12-13. The Court disagrees, at least with respect to the 2008 hard drive deletion. Whether or not Moore understood the *qui tam* investigation to have concluded, Gilead never issued any memorandum releasing those subject to its constraints from the hold.[2] Moore's duty to preserve was still in effect.

## II. Bad Faith

A party's destruction of evidence qualifies as "willful" spoliation if the party has "some notice that the documents were potentially relevant to the litigation before they were destroyed." *Leon*, 464 F.3d at 959; *see also Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 642 (S.D. Tex. 2010) ("Destruction or deletion of information subject to a preservation obligation is not sufficient for sanctions. Bad faith is required.") Here, the Court has already determined that Moore, as the plaintiff in the *qui tam* action, was on notice that the documents were potentially relevant to the litigation by the time he contacted an attorney in early 2006. *See supra*, Sec. I.

Moore also argues that he "did not know and could not have known that he was under a duty to preserve all documents regarding a wrongful termination lawsuit until November 2008 when he was actually terminated," and, therefore, could not have willfully spoliated documents in August 2008. Pl.'s Opp. at 9. This claim, however, is belied by a letter sent by Moore's former attorney Shelley Slade to Gilead's lead counsel on August 15, 2008. Slade wrote this letter to Gilead, following the DOJ's August 2008 revelation that Moore was the *qui tam* relator, to preemptively protect Moore from retaliation. She wrote, "[a]s I noted [in a phone conversation with an associate], we seek your help in ensuring that the company [Gilead] does not unlawfully retaliate against our client . . . If possible, we would like to avoid having to litigate any employment-based claims." Posner Decl., Ex. C. Moore was therefore on notice

---

[2] Gilead provides evidence that the DOJ investigation in fact had not concluded by that point; Moore objects to that evidence. The Court DENIES AS MOOT Moore's objections because it does not find the existence of the investigation dispositive one way or the other; what is important is that the hold was not lifted.

that documents on his computer could relate to a wrongful termination lawsuit as early as August 15, 2008. The wiping of his computer hard drive around that time therefore constitutes willful spoliation.

### III. Prejudice

The imposition of a harsh sanction such as dismissal or an adverse inference instruction requires an analysis of the prejudice suffered by the non-spoliating party. *See Anheuser-Busch*, 69 F.3d at 348. "The prejudice inquiry looks to whether the spoiling party's actions impaired the non-spoiling party's ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (*citing United States v. Kahaluu Construction Co., Inc.*, 857 F.2d 600, 604 (9th Cir. 1988).

Gilead argues that Moore's spoliation has impaired its defenses. It argues that the destruction of evidence particularly damaged its defenses to Moore's recently added disability claims. "Emails and other documents created by Moore from March through August 2008 - including those relating to his alleged 'disability' and sudden 'recovery' - are highly relevant to the question of whether Moore was actually disabled, as he claims, or exaggerating or fabricating his mental health issues, as the evidence suggests." Def.'s Reply at 11. Gilead also argues that its after acquired evidence defense - wherein it seeks to limit Moore's potential recovery based on evidence of independent misconduct, such as secretly taping his colleagues - is also likely hindered by the spoliation. Finally, Gilead claims that documents relating to the underlying (and now dismissed) *qui tam* action are likely destroyed, which could bear relevance to Moore's whistleblower claim.

Moore argues that Gilead has received all relevant documents in this litigation. He contends that he made and produced hard copies of all relevant documents from the hard drive of his laptop. Hening Decl. ¶ 14. Moore also points to Gilead's email backup system put in place in June 2007, known as eVault, and contends that it prevented the destruction of any email evidence. In its Response to Interrogatories, Gilead noted that Moore's emails "would have been retained in the routine legal hold collection process . . . When a legal hold is put in place, the journaling feature of the eVault system runs periodically and captures all emails within the scope of the hold, whether or not the user 'retains' the email." Hennig Decl., Ex. F. The system would not have captured emails sent from the laptop using a non-Gilead email account or documents saved on his local drives, however. Clewes Decl. ¶¶ 2, 6.

7

## IV. Appropriate Sanctions

After review of the evidence, the Court finds that sanctions are warranted, and that the appropriate sanction in this case is an adverse inference instruction related to Moore's disability claims. The jury will be instructed that it can infer from the fact that Moore destroyed evidence in August 2008 that the evidence, if available, would have been favorable to Gilead and harmful to Moore regarding the existence of a disability. The Court recognizes that an adverse inference instruction is "an extreme sanction and should not be taken lightly." *See Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 219 (S.D.N.Y. 2003). Here, however, Moore's spoliation of evidence, particularly in August 2008, was egregious. The Records Hold had been in place for over a year, and indeed, was put in place in response to Moore's own action in filing the *qui tam* complaint. Moreover, the August 15, 2008 letter from his former attorney to Gilead clearly demonstrated that he was aware that retaliation was a possibility, and that litigation could be imminent. He admitted to deleting the information in part because he considered Gilead his "enemy." In sum, it was willful and bad faith spoliation of evidence. Furthermore, Gilead has shown that it faces at least some prejudice from the spoliation, because the documents may have supported Gilead's claim that Moore was not, in fact, disabled. The laptop likely contained documents saved on local drives that could be useful in Gilead's disability defense. An adverse inference instruction is the appropriate sanction to remedy that deficiency.

The Court, acting within its inherent powers, does not believe dismissal or monetary sanctions are warranted. Gilead relies on *Leon* in arguing for outright dismissal with prejudice. The facts here are not as egregious as those in *Leon*. There, the plaintiff had received a letter specifically warning that he should "ensure no data on the laptop is lost or corrupted so as to avoid any possible despoliation of evidence." *Leon*, 464 F.3d at 955. The parties spent months negotiating the return of the laptop. Nonetheless, Leon deleted files and wiped his hard drive before returning the computer. Some of the files were relevant to the litigation; others were pornographic in nature. The court there found that Leon "appear[ed] to be without remorse," and found his written testimony "to be extremely evasive," and that he "can't answer a straight question that's being posed." *Id.* Here, when asked at deposition about the spoliating activity, Moore was honest with his motivations. Also here, between the eVault system,

8

1  Gilead's backup tapes, and the hard copies produced by Moore, Gilead appears to have a substantial
2  amount of the material that might otherwise have been affected by the spoliating activity. It is possible
3  that some non-privileged documents existed on the hard drive that would be relevant to a defense that
4  Moore was not disabled. Therefore, the Court will give the adverse inference instruction.

## CONCLUSION

Gilead's motion for sanctions is GRANTED IN PART. The jury will be instructed that it can infer from the fact that Moore destroyed evidence in August 2008 that the evidence, if available, would have been favorable to Gilead and harmful to Moore regarding the existence of a disability.

**IT IS SO ORDERED.**

Dated: February 29, 2012

SUSAN ILLSTON
United States District Judge