IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID MOORE, | No. C 07-03850 SI |
| Plaintiff, | **ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT; GRANTING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON REINSTATEMENT AND DAMAGES** |
| v. | |
| GILEAD SCIENCES, INC., | |
| Defendant. | |

The parties have filed cross-motions for partial summary judgment. Plaintiff David Moore moves for partial summary judgment on the fourth of his four causes of action: alleged violations of New York State Human Rights Law and New York City Human Rights Ordinances based on his disability. Defendant Gilead Sciences, Inc. ("Gilead") moves for partial summary judgment on Moore's claims for reinstatement and damages. The motions are scheduled for hearing on April 13, 2012. Pursuant to Civil Local Rule 7-1(b), the Court determines that these matters are appropriate for resolution without oral argument, VACATES the hearing, and hereby rules as follows.

**BACKGROUND**

**1.     The Qui Tam Action**

From 2003 to 2008, Gilead, a corporation that develops and markets pharmaceutical drugs and balms, employed plaintiff Moore as a Therapeutic Specialist, Gilead's term for a sales representative. Pl.'s Fourth Amended Compl. ("4AC") at ¶ 8. As a sales representative, Moore marketed HIV drugs in the Brooklyn, New York area. *Id.* On November 15, 2006, Moore sued Gilead under the *qui tam* provisions of the False Claims Act, alleging that Gilead was unlawfully paying physicians to induce them to prescribe Gilead's HIV/AIDS medications. *Id.* at ¶ 14. Moore alleged that Gilead's illegal

inducements caused the submission of false claims to Medicaid and Medicare, among other health care programs, in violation of state and federal law. *Id.*

Pursuant to the *qui tam* provisions of the False Claims Act, Moore's complaint was filed under seal. *Id.* The United States Department of Justice conducted an investigation into Moore's claims. *Id.* at ¶ 21. In August, 2008, the Department of Justice provided a redacted copy of the complaint, including Moore's identity, to Gilead. *Id.* at ¶ 24. On March 5, 2009 the United States and various states informed the Court that they declined to intervene in this action. *See United States v. Gilead Sciences, Inc.*, 04-4614-SI, Dkt. 22 (Mar. 5, 2009); *United States v. Gilead Sciences, Inc.*, 05-cv-4344, Dkt. 24 (Mar. 5, 2009).

### 2.  Moore's Disability Leave

Moore alleges that he experienced anxiety and insomnia problems resulting from being pressured to engage in illegal kickback activity as well as from the filing of the *qui tam* action. *Id.* at ¶ 19. Moore's anxiety was amplified, in early 2008, "by his fear that the company would fire him when it learned of his reporting to law enforcement." *Id.* at ¶ 15.

In February 2008, Moore received an annual performance review stating "improvement needed." *Id.* at ¶ 18; Brazier Decl., Ex. A (2007 Goals & Objectives Appraisal). Moore also began taking steps to look for a new job in early 2008, including asking a colleague, Gilead's Medical Science Director David Shepp, to write him a letter of reference. *Id.* at ¶ 16. The letter of reference was positive, stating that "David is one of the best [sales representatives] I have had contact with." *Id.*

On March 26, 2008, Moore took a medical leave of absence from Gilead "due to anxiety and insomnia that precluded him from working at Gilead without harm to his physical and mental well being." *Id.* at ¶ 19. He provided a physician's note to this effect from his doctor, Diana Williamson. *Id.*[1] Williamson estimated Moore's return date as May 15, 2008. Moore Dep., 251:14. Moore looked for other jobs during his leave. *Id.*, 256:12-14. Moore requested a number of extensions for his medical

---

[1] Gilead provides evidence that Williamson has since pled guilty to conspiracy to distribute a controlled substance and conspiracy to commit health care fraud, and is no longer licensed to practice medicine. Def.'s Opp. at 3, n. 2 (*citing* Brazier Decl, Ex. D (Docket Report of *United States v. Williamson, et. al.,* 10-cr-802 LAP (S.D.N.Y. 2010)).

2

leave. On May 17, 2008, Moore provided another note from Williamson clearing him to return to work on July 1, 2008. *Id.*, 256:24-257:4. Moore then received another note from Williamson, dated June 14th, 2008, that cleared him to work September 1, 2008. *Id.*, 259:16-18. According to Gilead's records, Moore did not provide this note to Gilead until August 1, 2008. *Id.*, 265:13-16. However, two weeks after receiving the June 14th note - on June 28th - Moore received a note clearing him to work on August 1, 2008. *Id.*, 267:1. Moore provided this note to Gilead on July 1, 2008. *Id.*, 268:10-12.[2]

On August 4, 2008, Gilead sent Moore a letter stating that his position was in the process of being filled. Brazier Decl., Ex. G (Aug. 4, 2008 Gilead Letter). At deposition, Moore stated he did not recall when he received the letter, but agreed that August 9, 2008 sounded "right." Moore Dep., 283:2-4. The letter noted that Moore had been placed on a "Gilead Medical Leave of Absence," on March 26, 2008, but that his twelve week entitlement to that leave pursuant to the federal Family and Medical Leave Act (FMLA) was exhausted as of June 17, 2008. *Id.* The letter stated that on June 18, 2008, he was placed on "Gilead Supplemental Medical Leave," which was unpaid. *Id.* The letter noted that Moore's multiple extensions, from May 15th, to July 1st, August 1st, and finally September 1, 2008. *Id.* The letter informed Moore that, "[D]ue to business necessity, the regular, full time position you held at Gilead is in the process of being filled. When you are able to return to work, if a position that matches your skills and qualifications is open at Gilead at that time, you may apply for and you will be considered for that role." *Id.*

On August 11, 2008, the United States provided Gilead with a redacted version of the complaint that Moore filed in the *qui tam* action. 4AC ¶ 24. The redacted complaint disclosed Moore as the *qui tam* plaintiff. *Id.* Moore states that due to the unsealing, he "felt like an enormous burden had been lifted." Pl.'s MSJ at 5; *see also* Moore Dep. 289:6-17 ("[O]nce the case was unsealed and the sky didn't fall and – I was just so elated."). On the same day, Williamson cleared Moore to work with no medical restrictions, and Moore sent Gilead a fax letter in which he stated that he was ready to return to work immediately. 4AC ¶ 22. Moore states, "though [he] had been out on disability leave for slightly

---

[2] When Moore was asked, "Do you know why you sent this [June 28, 2008] note on July 1, 2008, but waited to send the note of June 14, 2008, until the first day of August?" he responded, "I don't." Moore Dep., 268:13-16.

3

over four months, [Gilead] had not posted his position as an open position for which it was seeking applications." *Id.* at ¶ 23.

Gilead did not allow Moore to return to his position. On August 21, 2008, Gilead sent a letter to Moore stating that his position was in the process of being filled, and that Moore was being placed on a "Personal Leave of Absence" for 45 days, until September 25, 2008, "to allow you to search for positions within Gilead." Brazier Decl., Ex. I (Aug. 21, 2008 Gilead Letter). The letter continued, "if by September 25, 2008, you have not found a position within or outside the company, you will be separated from employment as of September 26, 2008." *Id.* Moore states that he was placed on this Personal Leave against his will, and did not receive a salary or medical benefits. 4AC ¶ 27.

On September 3, 2008, Gilead Human Resources employee Rochelle Haber-Loeffler sent Moore an email informing him that he was free to interview for his previous position as Therapeutic Specialist for Brooklyn New York. *Id.* at ¶ 29. Moore applied for that and other Therapeutic Specialist positions around the country. *Id.* Moore was invited to interview; however, "when [Moore] brought his attorney to this interview on September 17, 2008 to protect his rights, the company refused to hire him." *Id.* at ¶ 31. Moore interviewed without his attorney on September 29, 2008. *Id.* at ¶ 33. Gilead did not hire Moore. Instead, on November 3, 2008, Gilead sent a letter to Moore's attorney, stating that Moore was terminated on October 31, 2008 "following the expiration of his Personal Leave of Absence." Brazier Decl., Ex. I (Nov. 3, 2008 Gilead Letter). The letter listed a number of reasons for Moore's termination, including the low performance rating he received in early 2008. *Id.*

Moore alleges that Gilead illegally discharged him in retaliation for refusing to participate in Gilead's allegedly illegal schemes and for filing the *qui tam* action against it. *Id.* at ¶ 40. In the 4AC, Moore added allegations that Gilead discriminated against him on the basis of his disability by refusing to allow him to return to work when he was ready to do so. *Id.* at ¶ 51. Moore claims that Gilead violated the Federal False Claims Act, 31 U.S.C. § 3730(h) (Count I); New York Labor Law § 740 (Count II); New York False Claims Act, New York Finance Law § 191 (Count III); and New York State Human Rights Law and New York City Human Rights Ordinance (Count IV).

**3. The Spoliation of Evidence/Recordings**

4

On February 29, 2012, the Court granted Gilead's motion for sanctions due to Moore's spoliation of evidence in this case. *See* Dkt. 136 ("Sanctions Order"). At his deposition, Moore admitted to "wiping" the hard drive of his company-issued laptop multiple times in 2006 and at least once in 2008. The laptop had been given to Moore by Gilead to use as part of his work as a sales representative for Gilead. Moore Decl. ¶ 7. Moore also used the laptop for personal uses, as well as to communicate with his attorneys involved in the *qui tam* action. *Id.* at ¶¶ 4-8.

In order to wipe his computer, Moore purchased software called "Secure Clean 4," which, according to its user manual, is "designed to provide every user with the highest level of personal privacy protection by finding and overwriting old data, making it impossible to recover." Gaskins Decl., Ex. C, at CR-1. The software permanently erased files from the hard drive that Moore had designated for deletion. Moore Dep., 133:1-7. Moore used the software at least six times in 2006, the latest being on November 8th – one week before he filed the *qui tam* complaint. Gaskins Decl., Ex. C. CR1 at 3. According to Gilead's forensic analysis of the hard drive, the use of the applications resulted in the erasure of 10,040 deleted items. *Id.* at 14.

On December 7, 2006, having received a subpoena from the Department of Justice, Gilead issued a records hold memorandum (the "Records Hold"). Moore received the Records Hold, which stated that the recipient must "PRESERVE, AND NOT DESTROY" a number of categories of documents related to the *qui tam* complaint. Gaskins Decl., Ex. D. at 1-2.

Despite this, in August 2008 - around the time his name was revealed as the relator in the *qui tam* complaint - Moore performed a complete wipe of his hard drive. In order to do so, he used software named "Wipe Drive." Moore Dep., 113:16. The software rendered permanently irretrievable the data on his hard drive. When asked why he deleted the information from the hard drive in 2008, Moore responded that it "was a matter of personal privacy . . . How would you feel if your enemy was going through your emails?" Moore Dep., 111:18-113:-1. Based on the 2008 wiping of his hard drive, the Court crafted an adverse jury instruction: "the jury will be instructed that it can infer from the fact that Moore destroyed evidence in August 2008 that the evidence, if available, would have been favorable to Gilead and harmful to Moore regarding the existence of a disability." Feb. 29, 2012 Order, at 8.

In its motion for partial summary judgment, Gilead states that it learned of the 2006 hard drive

wipings on October 27, 2008 - four days before terminating Moore -- when it was informed of the activity by a computer forensic analyst. Beemer Decl., ¶ 13. Gilead learned of the 2008 hard drive wiping during discovery in the instant case, on November 22, 2010. *Id.* ¶ 15. On May 18, 2011, it was also revealed during discovery that in 2006, Moore had secretly conducted numerous audiotape recordings of his colleagues, supervisors, and doctors. Beemer ¶ 17.

Gilead argues that each of these three incidents -- the 2006 wipings, the 2006 tape recordings, and the 2008 complete hard drive wipe -- violated Gilead's company policies and would have independently led to Moore's immediate termination. Gilead seeks judgment on Moore's claim for reinstatement and damages (if the Court agrees that Moore would have been fired on the pre-termination date of October 27, 2008), or, in the alternative, judgment on reinstatement and limiting his potential damages to backpay through the date Gilead discovered the respective incidents (if the Court finds Moore would have been fired following his actual termination). Def.'s MSJ at 2.

## LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id.* at 324 (quoting then Fed. R. Civ. P. 56(e)). To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Id.* However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)).

## DISCUSSION

**1.     Moore's Motion for Partial Summary Judgment on Disability Claims**

Moore moves for summary judgment on his claim that Gilead violated New York State Human Rights Law ("NYSHRL"), Executive Laws § 296(a) and (3)(a), as well as New York City Human Rights Law ("NYCHRL"), Ordinances 8-107(1)(a) and (15)(a), by placing Moore on involuntary unpaid leave of absence and eventually terminating him on or about November 1, 2008. Moore argues that Gilead discriminated against him by refusing to provide him with a reasonable accommodation of his medical disability. 4AC ¶ 53. Under New York law, "a prima facie case of failure to accommodate requires a showing that (1) plaintiff was disabled within the meaning of the statutes[3]; (2) the employer had notice of the disability; (3) plaintiff could perform the essential functions of his or her job, with a reasonable accommodation; and (4) the employer refused to make a reasonable accommodation." *Miloscia v. B.R. Guest Holdings LLC*, 928 N.Y.S.2d 905 (Sup. Ct. 2011).

---

[3]The NYSHRL defines disability as:

> (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

N.Y. Exec. Law § 292 (McKinney). The NYCHRL defines disability as "any physical, medical, mental or psychological impairment, or a history or record of such impairment". *Phillips v. City of New York*, 66 A.D.3d 170, 181, 884 N.Y.S.2d 369 (2009).

7

Moore claims that he was disabled when he took a medical leave of absence; Gilead disputes this claim. 4AC ¶ 19; Def.'s Opp. at 9. Gilead states that its dispute arises from "(1) Moore's application for hundreds of similar jobs while supposedly disabled; (2) Moore's sudden recovery days after receiving notice from the Company that his job was being backfilled and hours after he received an extension of medical leave; (3) Dr. Patterson's [Gilead's independent medical examiner] determination that Moore was never disabled or unable to work; and (4) Williamson's suspect qualifications and 'diagnoses,' and her unusual relationship with Moore." *Id.* Because there is a genuine dispute of material fact, summary judgment is not appropriate on the grounds of actual disability. *See* Fed. R. Civ. P. 56(a).

Moore has an alternative line of argument as to why summary judgment is appropriate here. New York law also bans discrimination based upon a person's "perceived" disability. N.Y. Exec. Law § 296(5)(b)(1), (2); N.Y. City Admin. Code § 8-107(5)(b)(1); *see also Ashker v. Int'l Bus. Machines Corp.*, 168 A.D.2d 724, 726, 563 N.Y.S.2d 572 (1990) (*"*The statutory language is sufficiently broad, and the legislative history sufficiently supportive of an interpretation that nondisabled individuals like plaintiff, whom an employer wrongfully perceives as impaired, come within its reach.") Moore argues that "it is clear that [Gilead] perceived Mr. Moore as being disabled." Pl.'s MSJ at 9. In support, Moore cites the following deposition testimony from Leslie Beemer, Gilead's person most knowledgeable:

> Q: Now, was Mr. Moore – and again, Mr. Moore's disability leaves were approved every single time by Gilead?
>
> A: Mr. Moore's medical leaves were approved.
>
> Q: Okay. So Mr. Moore had, at least as Gilead was concerned, a valid medical condition that prevented him from returning to work on a full-time basis, correct?
>
> A: Correct. That's what his doctor had said.
>
> Q: And Gilead accepted his doctor's medical opinion, correct?
>
> A: Correct.
>
> Q: Okay. And Gilead didn't attempt to, for example, have Mr. Moore undertake an IME [Independent Medical Exam] with another doctor, correct?
>
> A: No, we did not.

Pl.'s MSJ at 9-10 (*citing* Beemer Dep., 230:22-231:21); *also citing* Beemer Dep., 40:7-25 ("Ms.

8

Beemer, does that mean that his doctor certified him as being unable to work, that Mr. Moore had a disability that prevented him from working at that time?" "Yes.") Moore argues that since he was "regarded as" disabled, he was protected under the Human Rights Laws whether or not he was actually disabled. Pl.'s MSJ at 8 (*citing Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997) (question of coverage under the "regarded as" disabled prongs of the American Disability Act and Rehabilitation Act "turns on the employer's perception of the employee, a question of intent, not whether the employee has a disability.")

The Court disagrees. Courts discussing liability for perceived disability focus on the *improper* or erroneous perceptions of the employer, often based on myth or prejudice. *See Petri v. Bank of N.Y. Co.*, 582 N.Y.S. 2d 608, 611 (Sup. Ct. 1992) (with respect to perception an employee has AIDS, "we are no more justified in victimizing individuals on the grounds of suspicions of disability than because we have knowledge of the real thing."); *North Shore Univ. Hosp. v. Rosa*, 600 N.Y.S.2d 90, 92 (App. Div. 1993) (despite not having HIV, plaintiff "may nevertheless seek redress . . . on the theory that, having been mistakenly evaluated as being at a higher than normal risk of HIV infection, he was incorrectly thought to be affected by a disability"); *see also School Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 272, 284 (in discussing Rehabilitation Act, stating that "[b]y amending the definition of 'handicapped individual' to include not only those who are actually physically impaired, but also those who are regarded as impaired . . . Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment.") Here, Moore does not claim that Gilead wrongfully perceived him to be disabled; he argues the precise opposite -- that he *was* disabled, and that Gilead is now wrongfully claiming that he was not. Moreover, Gilead believed Moore was disabled because Moore provided doctor's notes saying as much; they simply accepted them at face value and placed him on leave. 4AC ¶ 19. The Court finds that the "perception of disability" doctrine is inapplicable here, at least at the summary judgment stage.

In sum, questions of material fact remains regarding Moore's disability claims, specifically, whether he was actually disabled. Summary judgment is therefore not appropriate, and Moore's motion

9

is DENIED.[4]

**2. Gilead's Motion for Partial Summary Judgment on Reinstatement and Damages**

Gilead argues that whether or not Moore was wrongfully terminated, he would have been terminated for reasons independent of those complained of in this action. Specifically, Gilead states that had it known of the 2006 or 2008 hard drive wipes or the 2006 secret recordings of others while Moore was employed, it would have immediately terminated him. Gilead argues that pursuant to the "after acquired evidence doctrine," any backpay damages should end as of the date that Gilead became aware of this activity. Moore argues that even had Gilead been aware of these activities, he would not have been terminated, and, in any case, the conduct constituted legally protected activity.

"The 'after-acquired evidence' doctrine precludes or limits an employee from receiving remedies for wrongful discharge if the employer later 'discovers' evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct." *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1071 (9th Cir.2004) (citing *McKennon v. Nashville Banner Pub. Co*, 513 U.S. 352, 360–63 (1995)). "An employer can avoid backpay and other remedies by coming forward with after-acquired evidence of an employee's misconduct, but only if it can prove by a preponderance of the evidence that it would have fired the employee for that misconduct." *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 761 (9th Cir. 1996). The Supreme Court has held that in cases where such evidence is discovered, "neither reinstatement nor front pay is an appropriate remedy." *McKennon*, 513 U.S. at 362. Instead, "the beginning point in the trial court's formulation of a remedy should be calculation of backpay from the date of the unlawful discharge to the date the new information was discovered." *Id.*

The question before the Court is whether the uncontroverted facts show, by a preponderance of the evidence, that Gilead would have terminated Moore upon the discovery of the after acquired evidence. The Court finds that Gilead has not met this burden, on summary judgment, with respect to its October 27, 2008 discovery of the 2006 computer wipes. In 2006, prior to filing the *qui tam*

---

[4] Gilead also argues that there are questions of material fact about whether Gilead provided reasonable accommodation. *See* Def.'s Opp. at 15-18. Because the Court denies Moore's motion on other grounds, it need not reach this question.

10

1 complaint, Moore used the "Secure Clean 4" software at least six times to permanently erase from his
2 hard drive files that he had already designated for deletion. Moore Dep., 133:1-153:3; Beemer Decl.
3 ¶ 13. Gilead provides numerous written policies related to the prohibition of the destruction of business-
4 related documents.[5] Gilead also provides evidence that it terminated an employee for malfeasance with
5 respect to that employee's laptop. Beemer Decl., Ex. F. In that case, Gilead requested the employee
6 return his laptop; when the employee did so, Gilead discovered that the employee had exchanged his
7 hard drive with that of a former employee. *Id.* Citing the employee's already "tenuous" relationship
8 with Gilead due to "well documented performance deficiencies," Gilead terminated his employment.
9 *Id.* The Court finds that the activity in that instance was more egregious than Moore's, as it involved
10 potentially stolen proprietary data, as opposed to mere deletion. Moreover, Gilead discovered Moore's
11 2006 wiping activities on October 27, 2008, but did not mention it in Moore's termination letter of
12 November 3, 2008. *See* Brazier Decl., Ex. I. The letter references Moore's low March 2008
13 performance rating, his negative impression on a hiring manager, changes to Gilead's staffing priorities,
14 and a cryptic reference to violations of Gilead's Business Conduct rules, but makes no mention of the
15 hard drive wipes. Gilead has not proven that the undisputed facts show by a preponderance of the
16 evidence that Gilead would have fired Moore based solely on the 2006 wipes.

17 The Court finds that Gilead has met its burden with respect to the 2008 complete hard drive
18 wipe, which Gilead discovered on November 22, 2010. At the time Moore performed the 2008 wipe,
19 Gilead had put in place the December 2006 records hold in response the Department of Justice
20 subpoena. The records hold stated that the recipient must "PRESERVE, AND NOT DESTROY" a
21 number of categories of documents related to the *qui tam* complaint. Gaskins Decl., Ex. D. at 102.
22 Despite this, Moore used software that rendered permanently irretrievable the data on his entire hard
23 drive. Moore Dep. 111:1-16. There is no dispute that documents on Moore's hard drive related to the
24 *qui tam* action; indeed, that was Moore's rationale for deleting them. Moore Dep. 111:118-113:1.
25 Unlike in 2006, this was a complete wipe of the hard drive, as opposed to specific documents he had

---

27 [5]Gilead's Business Conduct Manual states: "All documents generated and required under the
28 policies contained in this Manual must be retained . . ." Beemer Decl., Ex. B. The Employee Conduct
Policy prohibits "falsification, material omissions or destruction of Gilead records." *Id.*, Ex. D.

11

already designated for deletion. The 2008 wiping would have been a second strike, as Gilead found about the 2006 wipings two years earlier.[6] As noted above, Gilead has produced numerous policies prohibiting destruction of Gilead documents. *See* Beemer Decl., Exs. B., D. Gilead has also submitted a declaration from Leslie Beemer, Associate Director of Employee Relations in Human Resources at Gilead. She states that, "[b]ecause Mr. Moore's conduct flagrantly violated numerous Company policies and legal requirements, and given my understanding of how prior instances of misconduct have been handled by the Company, I have no doubt that he would have been terminated immediately." Beemer Decl., ¶ 13. The human resource documents related to other employees who have been disciplined for behavior ranging from downloading copyrighted materials to swapping hard drives demonstrate that Gilead takes computer misconduct seriously. Beemer Decl., Exs. F and G. In sum, the uncontroverted facts prove by a preponderance of the evidence that Moore would have been terminated by Gilead had they discovered the August 2008 complete hard drive wipe.

Moore argues that even if he would have been fired for his conduct, the activity was legally protected and thus could not form the basis of a *legal* dismissal. Moore argues that while he was on medical leave in 2008, he continued to use his laptop to communicate with counsel, including questions "involving the FBI in relation to Mr. Moore's *qui tam* lawsuit. Moreover, Mr. Moore also sought to keep documents from Defendant in order to oppose and participate in stopping Defendant's illegal activities." Pl.s' Opp. at 15. Therefore, "Moore acted to oppose and participate in preventing the retaliation of [Gilead] by deleting computer files from his laptop in order to protect confidential communications between himself and his counsel." *Id.* Because it was protected activity, according to Moore, it could not form the basis of a lawful termination or a damage-limiting hypothetical end date.

The Ninth Circuit addressed a similar argument in *Oday v. McDonnell*, an age discrimination

---

[6] The Court recognizes the hypothetical nature of this analysis; Gilead would not have known about the 2006 wipings unless they had run a forensic analysis on Moore's computer, which in turn they may not have done unless Gilead had terminated Moore. However, this is the type of hindsight analysis necessary in cases applying the after-acquired evidence doctrine. *McKennon*, 513. U.S. at 362 ("Once an employer learns about employee wrongdoing that would lead to a legitimate discharge, we cannot require the employer to ignore the information, even if it is acquired during the course of discovery in a suit against the employer and even if the information might have gone undiscovered absent the suit.")

12

1 (ADEA) case. 79 F.3d at 763. There, the plaintiff, suspecting he would be fired, searched his
2 supervisor's office for his own restricted personnel file, found a list of employees recommended for
3 layoff, and later shared the list with several employees. Based on the defendant company's policies, a
4 human resources representative's affidavit, and "common sense," the Ninth Circuit found that plaintiff
5 would have been fired upon defendant's discovery of this misconduct, independent of his age
6 discrimination allegation. *Id.* The plaintiff argued in the alternative that his behavior was protected
7 activity because he was attempting to preserve evidence for his future lawsuit. The Ninth Circuit
8 applied the balancing test for determining whether conduct constitutes protected activity under the
9 ADEA, stating that "an employee's opposition activity is protected only if it is reasonable in view of
10 the employer's interest in maintaining a harmonious and efficient operation." *Id.* The court found that
11 plaintiff's activity was not reasonable, as "rummaging through his supervisor's office for confidential
12 documents [and] copying those documents and showing them to a co-worker," constituted a "serious
13 breach of trust." *Id.*

14 Accepting for the purposes of this order Moore's argument that the Court should adopt *Oday*'s
15 ADEA protected activity test in this False Claims Act and disability discrimination context, Moore fails
16 to show that the 2008 wipe of his hard drive constituted protected activity. As discussed in the Court's
17 February 29, 2012 Sanctions Order, Moore's August 2008 spoliation of evidence was egregious,
18 especially considering that "the Records Hold had been in place for over a year, and indeed, was put in
19 place in response to Moore's own action in filing the *qui tam* complaint . . . [Moore] admitted to deleting
20 the information in part because he considered Gilead his 'enemy.' In sum, it was willful and bad faith
21 spoliation of evidence." Feb. 29, 2012 Order, at 8. It was not reasonable opposition activity, *Oday*, 79
22 F.3d at 763; it was not protected activity; and it would have been a legal basis to terminate Moore's
23 employment.

24 The Court GRANTS Gilead's motion for summary judgment on Moore's claim for
25 reinstatement, and GRANTS Gilead's motion limiting back pay damages to those he would have earned

up to November 22, 2010.[7]

## CONCLUSION

Moore's motion for partial summary judgment on his disability claims is DENIED. Gilead's motion for summary judgment on reinstatement is GRANTED, and its motion limiting back pay damages to those he would have earned up to November 22, 2010 is GRANTED.[8]

On April 3, 2012, the Court suspended all pretrial dates in this matter pending resolution of the cross-motions for summary judgment. Having resolved them, the Court sets a Case Management Conference for April 20, 2012, at which time the Court will set a new trial date.

**IT IS SO ORDERED.**

Dated: April 10, 2012

SUSAN ILLSTON
United States District Judge

---

[7] The Court need not address Moore's secret recordings of his colleagues as the discovery date of that activity was after the 2008 hard drive wipe was discovered.

[8] Along with Moore's motion for partial summary judgment, Moore filed a "Separate Statement of Undisputed Facts." Gilead thereafter filed a motion to strike the statement as violative of Local Rule 56-2, which provides that no separate statement is allowed without Court order. As Moore's statement simply restated facts found elsewhere in the record, Gilead's motion is GRANTED.

14